**No. 69590.**—R. J. Saunders & Co., Inc. *v.* United States, protest 314987–K (New York).

FORD, Judge: The merchandise involved in this protest consists of electric dry shavers, imported from Holland and entered at the port of New York. It was classified by the collector of customs as articles having as an essential feature an electrical element or device, and assessed with duty at the rate of 13¾ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739.

The plaintiff claims that said merchandise is properly classifiable under paragraph 358 of the same act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as safety razors, dutiable at 12½ per centum ad valorem, but not less than 2½ cents each and 7½ per centum ad valorem.

The pertinent parts of the involved statutes, as modified, *supra*, are as follows: Paragraph 353:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, * * * wholly or in chief value of metal, and not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

    Other * * *_____ 13¾% ad val.

Paragraph 358:

Safety razors * * *_____ 12½% ad val., but not less than 2½¢ each and 7½% ad val.

The issue is whether the imported electric dry shavers herein come within the meaning of "safety razors," as that term is used in paragraph 358 of the Tariff Act of 1930, as modified, *supra.*

This is a retrial of the same issue already adjudicated in *R. J. Saunders & Co., Inc.* v. *United States*, 47 Cust. Ct. 27, C.D. 2274, affirmed in *R. J. Saunders & Co., Inc.* v. *United States*, 49 CCPA 87, C.A.D. 801. The court held, in that case, that electric dry shavers properly fell within paragraph 353 of the Tariff Act of 1930, as modified, as articles having as an essential feature an electrical element or device, rather than as safety razors under paragraph 358 of the said act, as modified.

The plaintiff now offers in and by the instant case further testimony and argument that the electric dry shavers herein should be classified as "safety razors" under the *eo nomine* provision of the aforesaid paragraph 358.

Following the filing of briefs by both counsel, plaintiff filed a reply brief, which will be referred to, *infra.*

The earlier case had been submitted on an agreed stipulation of facts, of which the first two paragraphs were incorporated herein at the trial. The pertinent portions are as follows:

1.—That the merchandise the subject of the above-entitled protest is described on the invoice as "SC 7759/08A—Double headed electric dry shavers" * * * that the sample of the said electric dry shavers submitted herewith may be received in evidence and marked Exhibit 1; and that electric dry shavers were not produced or known in 1930 and prior thereto.

2.—That the said electric dry shavers are used for shaving the beard and are operated by an electric motor enclosed in the casing; that they have two sets of blades and each set, consisting of six blades, is covered by a metal guard to prevent the skin from being cut during the shaving operation.

We note that we have for consideration the same electric shaver (plaintiff's exhibit 1, labeled "Norelco"), the same manufacturer, the same importer, the same issue as in the case heretofore adjudicated. Certain parts, a leather case, a small brush, and an electric cord with plugs accompanying the shaver, are not involved in the issue. Classification of the shaver itself is the only item in controversy.

The record herein consists of the testimony of one witness for the plaintiff, two exhibits introduced by plaintiff, and the two paragraphs of stipulated facts, *supra*. Exhibit 1 is the shaver. Collective exhibit 2, introduced to illustrate better the construction and functioning of exhibit 1, as the witness stated, "is a model of the guard and a cutter as they are mounted on the shaver, made on a large scale and reproduced exactly to scale * * *."

Jan R. Poletiek, witness for the plaintiff, testified that he is, and has been, since 1954, a mechanical engineer in charge of shaver development at the manufacturing plant in Holland. He identified exhibit 1, the item herein as an "S.C. 7759-08A, Double headed electric dry shaver." He disassembled it and explained, with the aid of exhibit 2, the various parts, an electric motor encased in a plastic housing which, when connected "to the mains," rotates two shafts extending from the housing. On the housing, is a holder part with two guards and two cutters. Each shaft has a cutter of six blades with keen cutting edges of a width of about 1.8 millimeters. The guard which covers the blade has a slotted opening and a circular slot on the inside in which the rotary blades run during the operation of the shaver. The blades run parallel to the face. The skin and beard protrude through the slots of the guards where contact with the skin is made by the blades. The slots act as a support for the beard, being supported by the walls of the slot. He explained that the dimensions of thickness in the guards maintain a safe minimum distance between the blade and skin, and stated that the shaver has been designed primarily for the purpose of shaving beards, although there are a few diversified uses of the instrument.

On cross-examination, Mr. Poletiek testified that it is not necessary to use shaving cream in order to shave with the electric dry shaver, and that the cutters come in contact directly with the skin. The blades on this imported shaver are approximately 1.8 millimeters wide and do not come any wider in this type of shaver. The Gillette-type razor is much wider than the blades on the imported rotary cutter, and it is possible that there is a difference in the tempering of the steel used in the manufacture of the rotary blades and the Gillette-type blade used in a safety razor. He stated the rotary cutter blades could not be removed from the housing and used by themselves to shave; that it is not possible to take a Gillette blade out of its casing and cut the hairs off the face because the Gillette safety razor is used as an assembly to keep the blade on the right angle on the face and to keep the contact of the blade to the face at a safe minimum, which is why it is a safety razor; that a single-edge razor blade can be used without the razor housing to shave the face; that, in this respect, the rotary cutters used with the imported Norelco shaver are different from the single-edge blade.

On redirect examination, the witness testified that there is a difference in the actual operation of shaving between the Gillette-type safety razor and the imported shaver, in that shaving creams are not necessary in the use of the said shaver because the hair is supported by the guard which holds the hair in an upright position, whereas, in the use of a safety razor and shaving cream, the hair is supported by the skin itself.

Plaintiff's counsel argues, in his reply brief, that the instant case differs from its aforesaid predecessor case in that we now have the added testimony of his highly qualified witness.

We have examined the testimony carefully but we do not arrive at the same conclusion as that urged by counsel for plaintiff, i.e., that the merchandise at bar is classifiable under the *eo nomine* provision for safety razors in the tariff act. While we agree an *eo nomine* provision in the tariff act contemplated not only the article of the day but articles of the same general class yet to be discovered, we fail to see the term safety razor of that day as embracing the electric dry shaver before us now.

Controlling the case at bar and involving the identical merchandise and issue, is the case of *R. J. Saunders & Co., Inc.* v. *United States, supra,* affirmed in C.A.D. 801, *supra.* From the latter decision, we quote:

It is settled that "tariff acts are intended to bring within the purview of their provisions imported merchandise which is described therein, notwithstanding the fact that such merchandise, at the time of the law's enactment, was not known in our international commerce." *United States* v. *L. A. Salomon & Bros.,* 22 CCPA 490, T.D. 47483. As stated in *Newman* v. *Arthur,* 109 U.S. 132:

The fact that at the date of the passage of the act goods of the kind in question had not been manufactured, cannot withdraw them from the class to which they belong, as described in the statute, where, as in the present case, the language fairly and clearly includes them.

We note, however, that it is also a settled principle that "the common or commercial meaning of an *eo nomine* designation in a tariff act must be determined as of the effective date of that act." *Wilbur-Ellis Co. et al.* v. *United States,* 18 CCPA 472, T.D. 44762. See also, *Rossman* v. *Hedden,* 145 U.S. 561.

Accordingly, we shall first consider the meaning of the eo nomine designation "safety razors" as of the effective date of the 1930 act. We shall then consider whether this meaning may be said "fairly and clearly" to include the electric dry shavers now before us, so that we can be reasonably sure of carrying out the intent of Congress, which is our primary responsibility.

### *The Meaning of "Safety Razors"* ### *In The 1930 Tariff Act as Enacted*

In determining the meaning of the term "safety razors" in the Tariff Act of 1930 at the time of its enactment, we note that this term first appeared in Title I, Section 1, paragraph 358 of H.R. 7456, which subsequently became the Tariff Act of 1922. Prior to that time, under the Tariff Act of 1913, safety razors were classified under the broad provision for razors, in paragraph 128 of that act. Also, prior to the enactment of the Tariff Act of 1922, the importation of safety razors was limited by reason of patent rights on such razors owned by the Gillette Safety Razor Company. At the Hearings before the House Ways and Means Committee, on General Tariff Revision, the brief of the Gillette Safety Razor Company discussed the "very large" effect that the expiration of the Gillette patent rights would have on "the importation of safety razors and blades similar to ours [Gillette's]." Since the Gillette Company had a virtual monopoly on the safety razor industry at that time, and could be expected, because of its leadership in the safety razor industry, to be the primary party affected by safety razor tariff legislation, it is clear to us that the specific provisions for safety razors and blades in the 1922 act were inserted mainly to protect the American industry producing razors and blades similar in structure and operation to that originally produced by the Gillette Company, a structure so well-known that we can take judicial notice of it. Such razors consisted then, and basically still do, of a blade which is a "thin plate, ground on one or both edges * * * the shaving edge [of which] is much shorter than that of the straight blade [i.e., the blade of the "old-fashioned straight razor"]." The razors were called safety razors because the blades were so mounted on a razor body and so related to an outwardly protruding guard underlying the blade that (1) the amount of physical contact of the blade with respect to the skin was held to a safe minimum, and (2) the blade could cut only when it was at such a small angle to the subject's skin that there was very slight danger of injury to the skin when the razor was moved approximately perpendicular to the cutting edge of the thin, plate blade.

The Tariff Act of 1930 reenacted, in present paragraph 358, the identical safety razor provision of the 1922 act, except for a lowering of the duty on unfinished

safety razor blades. The briefs submitted by the safety razor industry, contained in the Congressional hearings, prior to the enactment of the Tariff Act of 1930 were directed toward attempting to reinstate the duty on unfinished safety razor blades that existed in the 1922 act. There is no evidence in these hearings that Congress intended to protect any other industry than the very same safety razor industry considered by it when the 1922 act was promulgated.

### *Do the Words "Safety Razor" "Fairly and Clearly" Include Electric Dry Shavers?*

Appellant attempts to show that electric dry shavers are, in fact "fairly and clearly" included within the term "safety razor" by setting forth in its brief various definitions of the words "razor" and "safety razor." We agree with appellant that its definitions do show that the imported "electric dry shavers" are used, as are razors, " 'for *shaving* off the beard' and have 'guards for the blade(s) to prevent cutting the skin' during the *shaving* operation," as do safety razors. (Emphasis added.) We find, however, that such characterizations, though true, merely establish that "safety razors" and "electric dry shavers" are both "shavers." Such a premise, however, does not compel the conclusion that "electric dry shavers" are "razors." To take an extreme example, appellant defines a "razor," inter alia, as "a cutting implement for shaving off the beard or hair." We note, however, that a "shaver" may be defined as "that which shaves," i.e., that which removes "hair from (the face, legs, etc.) by cutting it close to the skin." Clearly, a razor is a shaver—but by such a definition so is an ordinary pair of scissors. To say that a razor and a pair of scissors (or an electric dry shaver which employs the same shearing action) are both razors because both are shavers is as logically untenable as concluding that since both roses and violets are flowers, violets are roses. The error in appellant's argument resides in the fact that they do not in any way relate "razors" or "safety razors" to electric dry shavers. The fact that has been overlooked is that the terms "safety razors" and "razors" do not collectively include all "shavers." Therefore, that which shaves is not necessarily a "razor."

Finding the record and contemporary dictionaries silent on the relationship between "safety razors" and "electric dry shavers," we shall now look at the imported articles themselves to see if they are "fairly and clearly" designated by the words "safety razors," which appear in paragraph 358.

In operation and appearance, the imported "Norelco" electric dry shavers are vastly different from the safety razors known in 1930. The two rotary, motor-driven blades of the imported shavers each have six cutting edges about $\frac{1}{16}$" wide and arranged in a circle. These blades do not contact the skin directly but run in frictional engagement with two circular perforated "guards" which completely overlie their respective rotary blades. As the shaver is passed over the skin, individual hairs protrude through these perforations. Each hair is cut by the shearing, scissor-like action that takes place when it is pinched between a cutting edge of a blade and the edge of the perforation in the guard through which the hair extends. No such pinching of hairs between two metallic edges with resulting shearing, scissor-like cutting occurs in the operation of a "razor" blade.

In operation and structure, therefore, we find that electric dry shavers may not "fairly and clearly" be included in the term "safety razors," as we find Congress used that term.

We note, in passing, the 1948 Summaries of Tariff Information, Volume 3, where the following comments appear, which are not inconsistent with the conclusions we have reached:

At page 87:

MACHINES WITH ESSENTIAL ELECTRICAL ELEMENTS, AND PARTS

(Par. 353)

Comment

\*      \*      \*      \*      \*      \*      \*

Among the more important articles *covered* by this summary are * * * *electric shavers* * * *. [Emphasis added.]

At page 165:
### SAFETY RAZORS, HANDLES, FRAMES, AND BLADES
(Par. 358)

\* \* \* \* \* \* \*

Comment

\* \* \* \* \* \* \*

*Not covered* in this summary are \* \* \* *electric shavers* (see summary on machines with electrical elements, par. 353) \* \* \*. [Emphasis added.]

There is little doubt that the provision for safety razors in paragraph 358 of the tariff act adopted June 16, 1930, by the House of Representatives, the Senate concurring, contemplated the lather or wet razor of that day, chiefly the Gillette-type safety razor.

We are more inclined to defendant's counsel's view that the aforesaid added testimony is merely a more detailed description of the electric shaver and its manner of functioning. It adds no material element or further evidentiary weight to the proposition that the instant electric shaver is not a safety razor within the meaning of the Tariff Act of 1930, as amended, and as has been adjudicated. It merely establishes that the beard hair is supported or held straight by the wall of the slot on the head of the shaver, while the rotating blade cuts it off.

We do not find it material to the issue herein that the contact between the blade of the electric shaver and the skin is held to a safe minimum by the carefully calculated slots and the thickness of the metal guards, or that the cutting blade is parallel to the surface of the skin. A showing that this electric shaver is safe does not constitute it a safety razor. The added testimony of the witness adds nothing materially different to the record in C.A.D. 801, *supra*, and a departure from the decision there would be unwarranted.

In the opinion of this court, the electrical feature of the electric dry shaver in the case at bar compels its classification, fairly and clearly as an article having as an essential feature an electrical element or device under paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739, and that the principles as laid down in *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050, and in *R. J. Saunders & Co., Inc.* v. *United States, supra*, affirmed in C.A.D. 801, *supra*, are controlling.

For the reasons stated, the protest is overruled, and judgment will issue accordingly.